FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

99 MAR 31  PM 5: 56

U.S. DISTRICT COURT
N.D. OF ALABAMA

STANLEY L. REED,                          }
                                          }
    Plaintiff,                        }
                                          }
v.                                        }    **CASE NO. CV-96-B-2925-S**
                                          }
PEMCO AEROPLEX, INC.,                     }
                                          }
    Defendant.                        }

**ENTERED**

**MAR 3 1 1999**

### MEMORANDUM OPINION

Plaintiff Stanley Reed, an African American, is a former employee of defendant Pemco

Aeroplex, Inc. ("Pemco"). Reed alleges that Pemco violated his rights under 42 U.S.C. § 1981

and Title VII of the Civil Rights Act of 1964 ("Title VII"). Specifically, Reed makes the

following three claims: 1) Pemco discharged him from his job as a cleaner because of his race; 2)

Pemco terminated his employment in retaliation for "protected conduct;" and 3) Pemco subjected

him to a racially hostile working environment.

Currently before the court are motions for summary judgment filed by both parties.

Defendant has moved for summary judgment on all claims asserted by the plaintiff. Plaintiff's

motion for summary judgment is a partial motion. It seeks summary judgment on the issue of

liability for purposes of his hostile environment claim only. Upon consideration of the record, the

submissions of the parties, the argument of counsel, and the relevant law, the court is of the

opinion that the defendant's motions for summary judgment as to the claims of discriminatory

discharge, retaliatory discharge and racially hostile environment are due to be granted and that

plaintiff's motion for summary judgment as to the racially hostile environment claim is due to be denied.

## I. FACTUAL SUMMARY

Defendant Pemco is engaged in the business of aircraft overhaul and modification. (Knight Dep. at 13). Pemco employs approximately 950 people at its main facility in Birmingham, Alabama. (*Id.* at 14). Reed estimates that the workforce at Pemco was less than ten percent African-American. (Reed Dep. at 210). Pemco was known as Hayes International Corporation until Precision Standard, Inc., a company headquartered in Denver, Colorado, purchased the company in 1988 and renamed it Pemco Aeroplex. (Knight Dep. at 25).

Reed was first employed as a cleaner [1] by Hayes International Corporation on June 29, 1981 and remained in that position throughout his employment with Pemco. (Reed Dep. at 17-18). He was a member of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America and its Local No. 1155 (the "union" or "UAW") during his tenure with Pemco. (*Id.* at 42-43). Reed was first assigned to the C-130 project when he began working at Pemco. (*Id.* at 45-46). He was later assigned to the wash rack, then re-assigned to C-130, then back to the wash rack before finally being assigned to the KC-135 project.[2] (*Id.* at 61). From time to time, he was "loaned out" on a temporary basis to perform jobs under other supervisors. (*Id.* at 56).

---

[1] A cleaner is a "corrosion specialist" who strips airplanes of paint, sands them, and repaints them. (Reed Dep. at 43).

[2] The project monikers refer to the airplane models and the wash rack is a separate department where airplanes are stripped. (Reed Dep. at 44).

2

Reed first reported racially-motivated conduct at Pemco in 1982 or 1983 during his first C-130 project assignment. (Reed Dep. at 63). He made approximately three complaints to W.O. Lee, supervisor of inspectors on the project, about coworkers John Salters and Larry Updike calling him the racially derogatory name "Buckwheat." (*Id.* at 63-65). The coworkers allegedly called Reed "Buckwheat" over 100 times "as a joke." (*Id.* at 67). Although Lee did tell Updike to stop the name-calling "at least two or three times," Reed claims the conduct did not cease. (*Id.*. at 69). Reed has no knowledge of any disciplinary action being taken against his coworkers. (*Id.* at 67-69). Updike was later promoted to supervisor. (*Id.* at 66). As recently as 1997, Updike was serving in this capacity at Pemco, and Salters was employed as a mechanic. (*Id.* at 66-67). Reed asserts that Salters called him Buckwheat "a little before I was terminated [in 1995]." (*Id.* at 76-77).

During his time under Lee's supervision, Reed also reported the circulation of "Nigger Applications." (Reed Dep. at 71). These mock employment applications base their questions on racially offensive stereotypes of African-Americans. (*Id.* at 71). Variations of these applications circulated throughout the plant and, according to Reed, his coworkers, including Updike, duplicated copies in supervisor Lee's office for circulation. (*Id.* at 72-73). Copies were distributed to toolboxes, posted on bulletin boards, and found in bathrooms. (*Id.* at 73). Reed concedes, however, that the last time he saw one of the applications at Pemco was when he left the C-130 project in 1983 or 1984 for his first assignment on the wash rack. (Reed Dep. at 79).

3

During one of his assignments to the C-130 project, Reed also witnessed an instance where a racial epithet was used during a conversation between two supervisors.[3] (*Id.* at 160). According to Reed, he was in the presence of a white supervisor commenting to an African-American supervisor that a group of African-American workers were "niggergating." (*Id.* at 164). Reed interpreted this term as a play on the word "navigating." (*Id.* at 164). Reed admits that he did not report this incident to the supervisors' superiors. (*Id.* at 166).

Reed admits that he reported no racial conduct during his first wash rack assignment. (Reed Dep. at 61-62). His deposition testimony also reveals no allegations specific to his second stint on the C-130 project. (*Id.* at 79-80).

During his second wash rack assignment, which began sometime in the early 1990s and continued until he was assigned to the KC-135 project in 1993 or 1994, Reed claims that he complained about blacks carrying a disproportionately larger share of the work load than whites. (*Id.* at 309). He allegedly complained to supervisor Jimmy Moore that "these white folks need to go to work." (*Id.* at 315). He based his complaints on the belief that white cleaners were seldom required to perform several tasks which were required of black cleaners, such as stripping bellies of airplanes, b-blasting, and cleaning wheel wells. (*Id.*). Moore allegedly had no response to Reed's complaints. (*Id.* at 314). Reed made similar complaints to supervisor Claudia Russell. (*Id.* at 316). In response, Russell took Reed to her supervisor, Bullock, who was head of the wash rack department. (*Id.* at 316-17). Reed contends that Russell made discriminatory job assignments, leaving "gravy" jobs to white cleaners. (*Id.* at 318). Reed believes he was singled

---

[3] Reed neither specified what year this incident occurred nor whether this incident occurred during his first or second assignment to the C-130 project. (Reed Dep. at 160-66).

4

out as a "troublemaker" after making his complaints. (*Id.* at 322-23). Reed limits his complaints about disparate work assignments to his experience under Russell and Moore. (*Id.* at 323-24).[4]

During Reed's second wash rack assignment, he served two, separate suspensions involving Russell, an African American. (Vines Decl. at ¶ 5). In each instance, Reed had allegedly exhibited insubordinate behavior towards Russell. (*Id.*). Under Company Rule 13, the disciplinary action for insubordinate behavior may range from suspension to discharge for a first-time offender. (Vines Decl. at ¶ 5, Ex. D).

Reed was eventually assigned to the KC-135 project in either 1993 or 1994. On June 4, 1994, Reed was suspended pending discharge for refusing to follow Russell's directions and directing disrespectful and abusive language towards Russell. (Vines Decl. at ¶ 5, Ex. B). He was eventually discharged on June 6, 1994. (Reed Dep., Def.'s Exh. 15). Reed filed an EEOC charge in July 1994 ("1994 EEOC Charge"), claiming that he had been fired on the basis of his race. (*Id.*). The 1994 EEOC Charge states that plant manager Jeff Drummond informed Reed that he was "being discharged for insubordination for calling my supervisor, Claudia Russell, a 'winch' and for not following Ms. Russell's verbal instructions concerning the wearing of safety clothes." (*Id.*). Reed claimed that white cleaners had "literally cursed out Ms. Russell to her face, without being disciplined." (*Id.*). Reed filed a grievance and succeeded in gaining reinstatement and back pay through arbitration. (Vines Decl. at ¶ 5).

---

[4] Although Reed cannot recall whether he made complaints about his wash rack assignment before or after his 1994 discharge, the record clearly indicates that he worked only on the KC-135 project after his reinstatement in 1995. (Reed Dep. at 45). Furthermore, he recalls that Moore and Russell rotated as his supervisors during his assignment on the wash rack. (*Id.* at 317-18). Because his conduct towards Russell was the impetus for his 1994 discharge and because he never worked for Russell and Moore after his 1995 reinstatement, his complaints to Russell and Moore must have been lodged prior to his discharge.

5

Reed returned to work in January 1995 and continued his assignment on the KC-135 program,[5] where he worked until his discharge in November 1995. Reed reported to production supervisor Ray Jimerson, an African American.[6] (Reed Dep. at 49). Jimerson reported to Mark Hornbuckle, who reported to Kirk Lutman. (*Id*.).

On the KC-135 project, Reed first reported racial conduct to Kurt Lutman. (*Id.* at 97). Reed's complaint stemmed from an accident where he spilled chemicals on the face of coworker Jeff Payne. (*Id.* at 99). In response, Payne allegedly kicked and cursed Reed, calling Reed a "black ass." (*Id.* at 99-100). When Reed reported the altercation to Lutman, Lutman asked Reed what Reed wanted to be done about the incident. (*Id.* at 99). Reed left the decision up to Lutman and believes that no subsequent action was taken because Payne "is the kind of guy he would have came back and let me knew about it." (*Id.* at 100-01). To Reed's knowledge, Lutman never spoke to Payne. (*Id.* at 101). Lutman testified that he confronted Payne and asked two other individuals working on the aircraft what happened. (Lutman Dep. at 33). Payne denied wrongdoing. (*Id.*). The other two employees just saw plaintiff knock something over and heard some words exchanged. (*Id.*). However, neither employee saw Payne kick the plaintiff. (*Id.*). Thus, Lutman did not believe that he had sufficient grounds to take disciplinary action against

---

[5] Reed has testified that he began working on the KC-135 project in 1993 or 1994, before his first discharge. (Reed Dep. at 110).

[6] By Reed's own account, several of his former direct supervisors are African Americans. (Reed Dep. at 50-54). Of course, the probative value of the race of his supervisors is limited; black supervisors can certainly contribute to a black employee's hostile work environment. In holding same-sex sexual harassment actionable under Title VII, the Supreme Court noted "'it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of that group.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, __, 118 S.Ct. 998, 1001 (1998) (quoting *Castaneda v. Partida*, 430 U.S. 482, 499 (1977)).

6

Payne. (*Id.*). Lutman then spoke with the union steward and asked the steward to tell the employees that if they were "messing with Stanley, to back off," because if he could ever prove that they were mistreating the plaintiff, Lutman would take disciplinary action against each one of them. (*Id.* at 32-34). Plaintiff does not complain of any further racial remarks from Payne.

Reed also complained to Mark Hornbuckle, who was the supervisor of Reed's direct superior, and to Lutman that L.A. Dawson, a sheet metal worker or a mechanic, had threatened him after Reed almost hit Dawson with a bicycle[7] by telling him that "if [Reed] hit [Dawson] with a bike, [Reed]'ll be one dead nigger."[8] (Reed Dep. at 83). This incident is reported by Lutman to have occurred in 1994. (Lutman Dep. at 16). After confronting Dawson, who denied the incident, and questioning a witness, who refused to get involved, Lutman allegedly told Reed that "there was nothing [Lutman] could do about it." (Reed Dep. at 88). Lutman claims that he only engaged in "verbal counseling" and refused to accuse anyone of wrongdoing because he had told Reed to put a formal complaint in writing and Reed had failed to do so. (Lutman Dep. at 15). Reed denies that he was ever told to put a complaint in writing, and he knows of no action taken against either Dawson or the witness. (Reed Dep. at 234-35).

Reed further claims that he was reprimanded for allegedly committing the racial sin of looking at a white woman. (*Id.* at 89). According to Reed, he rode his bike by a white female supervisor who was wearing tight pants. (*Id.*). After the white supervisor reported his conduct to

---

[7] Because of the size of the Pemco facility, workers use bikes as transportation. (Reed Dep. at 85).

[8] Although Lutman recalls this incident as occurring in late 1994, the incident more likely occurred in 1995 because Reed had been discharged from June 1994 through January 1995. (Lutman Dep. at 16).

7

the union, Reed was called into Lutman's office where, in a meeting with Lutman, Hornbuckle, and a union steward, Reed was told that a disciplinary letter would be written and placed in his personnel file if another incident occurred within thirty days. (*Id.* at 90-94). Reed denies having paid any "attention" to the white supervisor. (*Id.* at 91). He feels that this incident carried racial overtones because "there's been times when [his coworkers] said that a black man can't look at a white woman." (*Id.* at 94). Reed concedes that no Pemco supervisors have made such statements and neither his race nor the white supervisor's race ever came up during his meeting in Lutman's office. (Reed Dep. at 94-96).

Also, while assigned to the KC-135 project, but before his reinstatement in January 1995, Reed allegedly reported to Hornbuckle that a rope, tied in a manner used for lynching, had been left on his toolbox. (*Id.* at 130-31). According to Reed, Hornbuckle had no real response and took no subsequent action. (*Id.* at 134-36). Reed claims that following that incident, he again saw lynching ropes tied to tails of airplanes and, in plain view, hanging on stands along the center aisle. (*Id.* at 143-44). Though he can even recall seeing someone tying one of these ropes, Reed states that he tries to "block out" these incidents because "I liked my job." (*Id.* at 143). However, he never saw one of these ropes after his reinstatement in January of 1995. (*Id.* at 147).

Reed alleges that during his entire time at Pemco inscriptions reading "KKK" were "a common thing . . . . You used to could see it on anything." (Reed Dep. at 186). He has provided photographs, purportedly taken in 1994 or 1995, of some of this graffiti. (*Id.* at 179). For example, he reports that a "KKK," with each "K" roughly sixteen inches high, was scratched on the side of a roll-up staircase that is used for access to the entrances of airplanes. (*Id.* at 180).

8

"KKK" was also found on gearboxes of airplanes, garbage drums, steps, walls, and "every bathroom at Pemco except for the corporate office." (*Id.* at 183-87). Reed states that he reported the graffiti to Ms. Smith, a member of a committee at Pemco, and Jeff Drummond, Kirk Lutman's superior. (*Id.* at 187-88).

Reed also claims that, throughout his employment with Pemco, racial jokes pervaded the workplace, and sexually explicit pictures of African-American females filled the bathroom walls. (Reed Dep. at 189-92). He has no idea who drew the pictures, but states that "it happens so much that they constantly paint the wall out there or repair them." (*Id.* at 190). As for the racial jokes, Reed cannot recall a specific joke and cannot identify any perpetrators other than Updike and Puckett, the union steward. (*Id.* at 194-98). He states that he would "clear the area" when he heard the jokes being told to avoid getting upset because "that job don't come by every day." (*Id.* at 196). Reed admits that he has himself told racial jokes and used derogatory racial terms, but he denies doing so on the Pemco premises. (*Id.* at 203-05).

Reed recounts a series of events occurring on November 11, 1995, which ultimately led to his discharge. According to Reed, he began the day working on a job for Jimerson. (*Id.* at 242). An unidentified worker told Reed that a bicycle in Reed's work area was the worker's and that Reed should not be riding the bicycle. (*Id.* at 246-47). Later, Retha Mae Lee, a painter, had just agreed to help Reed with his job when Carl Bonds, a supervisor who was not normally in charge of Reed, approached the two of them. (*Id.* at 244). Apparently, Bonds had been riding the bicycle before it was left in Reed's work area. (*Id.*). When Reed relayed the unidentified worker's comments about the bicycle, Bonds supposedly retorted, "You tell him I said he can kiss my ass." (*Id.*) In response, Reed allegedly told Bonds "he needed to watch his mouth in the

9

presence of the lady." (*Id.* at 245).

Fifteen minutes after his exchange with Reed, Bonds informed Reed that Bonds was Reed's supervisor (i.e., that Reed was "loaned out" to Bonds). (Reed Dep. at 248). According to a written statement by Bonds, Reed failed to accomplish his given tasks and was insubordinate when he ignored Bonds's request to go to the office. (Bonds Dep. at 9-10). In a similar statement by Jimerson, Bonds asked Jimerson later in the day if Reed had been pulled from Bonds's job because the job had not been completed. (Vines Decl. ¶ 4, Exh. A). Jimerson claims that Reed said "NO, Mr. Jimerson is my Boss" when Bonds requested Reed to go to the office. (*Id.*). (emphasis in Exh. A). Jimerson states that even after he told Reed "No, I've loaned you to Mr. Bonds for a particular job. Mr. Reed became insubordinate after Mr. Bonds had asked him to the office for the 2nd time!" (*Id.*). (emphasis in Exh. A). Another supervisor, Greg Myers, also gave a statement that essentially corroborated the assessment of Bonds and Jimerson that Reed was insubordinate by ignoring Bonds's repeated request for Reed to go to the office. (*Id.*) Plaintiff's testimony is that he did not hear Bonds's instructions. (Reed Dep. at 272). Reed further stated that on the preceding day, Bonds requested Solomon to perform the same job as he was asked to do and Solomon refused. Bonds, however, asserts that Jerry Solomon rightly refused because the area was still wet from being sprayed with noxious chemicals. (Bonds Dep. at 14). Bonds further testified that the when he asked the plaintiff to do the job, the chemicals were not wet. (*Id.* at 15). According to the information that Lutman provided to Vines, at least three other employees, in addition to Bonds, witnessed plaintiff's refusal to go to the office: Greg Myers, Ray Jimerson, and Kirk Lutman. (Vines Decl. ¶ 4).

10

On November 13, 1995, Lutman suspended Reed pending discharge. (*Id.*). Pemco's director of human resources and labor relations, John Vines, made the final decision to terminate Reed's employment for violation of Company Rule 13. (Vines Decl. ¶ 7). Vines allegedly relied on the statements of several individuals who claim to have witnessed Reed disobey Bonds's repeated instruction to go to the office. (Vines Decl. ¶ 4). Reed agrees that John Vines was responsible for the final ruling that Reed be terminated. (Reed Dep. at 407). Vines asserts that at the time of his decision, he was not aware of the incident involving Bonds, Retha Mae Lee, and Reed. (Vines Decl. ¶ 8). Vines acknowledges that he was aware of Reed's previous 1994 EEOC Charge, which did not include a racial harassment claim, but denies that he had any knowledge of Reed or any other Pemco employee experiencing racial mistreatment. (Vines Decl. ¶ 13). Represented by the UAW, Reed filed a grievance and unsuccessfully pursued the matter in arbitration. (Reed Dep. at 305).

Vines is "not aware of any other bargaining unit employee at Pemco who was insubordinate on three or more occasions within a three-year period, and towards more than one supervisor, who was not discharged."[9] (Vines Decl. at ¶ 10, Ex. D). He further contends that "Pemco had written policies prohibiting discrimination, and specifically racial harassment." (Vines Decl. at ¶ 11). These policies were allegedly posted throughout the facility and contained in a manual. (*Id.*). Vines adds that a "hotline" phone number was available for anonymous and confidential reporting of discriminatory behavior. (*Id.*).

---

[9] Vines attests that he was aware that Lutman had experienced "difficulties"in supervising Reed. Specifically, Lutman had sent Vines a memorandum in October 1995 documenting Reed's involvement in an argument with another coworker which created a "disturbance" in the workplace. (Vines Decl. at ¶ 6, Ex. C).

## II. SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

### A. Discriminatory Discharge

Reed alleges that Pemco discriminated against him on the basis of his race when it terminated his employment. *See* Compl. at ¶ 15. Claims of discriminatory discharge under Title

12

VII and 42 U.S.C. § 1981 are governed by the familiar, tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).[10] Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53. If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant succeeds in carrying this burden, then the plaintiff must prove that the defendant's articulated reasons are a mere pretext for unlawful motives (i.e., race discrimination or retaliation). *Burdine*, 450 U.S. at 253. A plaintiff's prima facie case coupled with sufficient evidence to allow a fact finder to disbelieve the employer's proffered explanation for its actions is enough to preclude entry of judgment as a matter of law. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997); *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). At all times, the plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

In cases where the plaintiff was discharged for violating a company policy or rule, the plaintiff may establish a prima facie case by showing (1) that he is a member of a protected class, (2) that he was qualified for the job from which he was discharged, (3) that he was discharged, and (4) that his former position was filled by a white employee or that the misconduct for which

---

[10]     Although the statutory language and remedies of 42 U.S.C. § 1981 are distinct from Title VII, the allocation of the burdens of proof and the analysis for determining whether a defendant employer unlawfully discriminated against an employee are the same. *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994). This Memorandum Opinion's discussion of Reed's claims under Title VII is equally applicable to the plaintiff's claims under § 1981.

he was discharged was "nearly identical" to that engaged in by a white employee whom the employer decided to retain. *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir. 1991); *Hawkins v. Ceco Corp.*, 883 F.2d 977, 984 (11th Cir. 1989), *cert. denied*, 495 U.S. 935 (1990); *Jones v. Gerwens*, 874 F.2d 1534, 1539-40 (11th Cir. 1989); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).

Reed has satisfied the first three elements of a prima facie case of discriminatory discharge. However, he has not satisfied the fourth requirement which requires a showing that he suffered from a differential application of work or disciplinary rules. The plaintiff bears the burden of showing a similarity between his conduct and that of any white employees who were treated differently. *Gerwens*, 874 F.2d at 1541. Reed has not satisfied this burden. He has not presented any evidence concerning the race of the employee who replaced him. Nor has he produced any evidence of a white employee with a similar disciplinary record for insubordination. The only evidence the plaintiff offers in an attempt to show disparate treatment is a single incident involving a white cleaner named Jerry Solomon. The plaintiff claims that Solomon previously refused to follow the directions of his supervisor, but was not reprimanded for insubordination. However, the record shows that Bonds assigned Solomon to clean a particular section of an airplane. When Solomon went to the plane he discovered that it was still wet from having been recently sprayed with noxious chemicals. For that reason, Solomon told Bonds that he could not do the work. The plaintiff contends that Solomon's "refusal" was insubordination and that Pemco's failure to terminate Solomon amounts to disparate treatment based upon race.

The plaintiff's contention is not supported by the undisputed facts on the record. First, the undisputed facts do not support the allegation that Solomon's conduct was an act of

14

insubordination. Solomon's refusal to perform his assignment was due to the fact that the wet chemicals were deemed to be dangerous. After being told that the chemicals were still wet, Bonds concurred with Solomon's refusal to work on the plane that particular day. Conversely, the chemicals were not wet the next day when Reed was given the assignment. Furthermore, Solomon is not a proper comparator given the plaintiff's track record of insubordination. The plaintiff has been reprimanded for insubordination several times by his supervisors. In contrast, even assuming that Solomon's actions constituted insubordination, he is only guilty of one act of insubordination. In addition, the plaintiff was not fired for his refusal to proceed with his assignment. Rather, the plaintiff was terminated for refusing instructions to go the office when so commanded by his supervisor.

Assuming that plaintiff could establish a prima facie case, Pemco has offered a non-discriminatory reason for plaintiff's discharge, that is, his repeated insubordination. The Eleventh Circuit explained the district court's role in such a case as follows:

> The district court's task is a highly focused one. The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct." The district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, or inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence."

*Combs*, 106 F.3d at 1538. Plaintiff has not carried his burden. Plaintiff has not offered any evidence, much less substantial evidence, that would tend to suggest that anything other than his disciplinary record for insubordination, earned largely under the supervision of other African-

15

Americans, motivated John Vines's decision to terminate his employment.

The plaintiff has made many allegations of racial misconduct by employees of Pemco. Even if these allegations are true, there is no evidence of racial bias or misconduct on the part of the final decision maker in this instance, John Vines. Vines was presented with the testimony of three witnesses that Reed had refused to follow an order given by his supervisor. Furthermore, Vines also knew that Reed had a history of disciplinary actions taken against him because of insubordination. The plaintiff presented no evidence of any racially biased actions or decisions made by Vines. Because the evidence on the record suggests that Vines's only motivation for terminating Reed was because of the present and past incidents of insubordination, the plaintiff lacks any evidence in which to create an issue of pretext.

Finally, even if the plaintiff's version of events in his encounter with Bonds is accurate and Reed is in fact innocent of the charge of insubordination, the outcome is still the same. "The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Gerwens,* 874 F.2d at 1540. In making his decision, Vines had the statements of Bonds and three eyewitnesses who all agreed that plaintiff was openly insubordinate as compared to plaintiff's uncorroborated account that he did not hear Bonds. Vines's belief, given the information before him, cannot be reasonably disputed. Thus, the plaintiff's contention that he did not hear the instruction to go to the office does not create an issue of pretext

16

## B. Retaliatory Discharge

In order to establish a prima facie case of retaliation under Title VII,[11] the plaintiff must show (1) statutorily protected conduct, (2) adverse employment action, and (3) a causal link between the protected conduct and the adverse action. *Meeks v. Computer Associates Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991).[12] If the plaintiff establishes a prima facie case, the defendant may come forward with legitimate reasons for the employment action to negate the inference of retaliation. *Id.* If the defendant offers legitimate reasons for the employment action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reasons offered by the defendant are pretextual. *Id.*

Plaintiff relies on several incidents as evidence of protected conduct. He contends that his termination was in retaliation for filing a prior grievance against the company. However, the grievance plaintiff filed relative to his June 1994 discharge does not constitute protected conduct. Statutorily protected conduct pursuant to Title VII is conduct by an employee opposing "any practice made an unlawful employment practice by this subchapter, or because he has made a

[11]Section 704(a) of Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, . . . because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing, under this subchapter.

42 U.S.C. § 2000e-3(a).

[12]Section 1981 also provides a cause of action for retaliation. *Andrews v. Lakeshore Rehabilitation Hosp.*, 140 F.3d 1405, 1412-13 (11th Cir. 1998). The court applies the same burden shifting standards to Section 1981 retaliation claims as used in Title VII retaliation claims.

17

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Little v. United Technologies*, 103 F.3d 956, 959 (11ᵗʰ Cir. 1997)(quoting 42 U.S.C. § 2000e-3(a)). Plaintiff's only contention in his 1994 grievance was that Pemco lacked "just cause" for termination. It is undisputed that his grievance did not allege race discrimination. Thus, the plaintiff's act of filing a grievance does not constitute protected conduct.

Reed also contends that he was fired in retaliation for the incident involving himself, Bonds and Ms. Lee. Plaintiff apparently takes the position that Bonds's statement amounted to sexual harassment, and therefore, by calling Bonds "on the carpet" plaintiff was opposing a practice made unlawful by the Act. *See* 42 U.S.C. § 2000e-3(a). While the practice opposed does not have to constitute an actual violation of Title VII, the employee does have to have a reasonable and good faith belief that the practice is unlawful. *Meeks,* 15 F.3d at 1021; *EEOC v. White & Son Enterprises*, 881 F.2d 1006, 1012 n.5 (11th Cir. 1989). The statement that Bonds made in front of Lee was that some third person can "kiss my ass." There is nothing sexual about this comment. It was not made towards Ms. Lee, and there is no evidence that it was made in reference to any woman. Plaintiff could not have had a reasonable and good faith belief that Bonds's profanity violated Title VII. To the extent plaintiff's retaliation claim is based upon this incident, it fails.[13]

The only evidence the plaintiff can present that would constitute protected conduct known to the decision maker, John Vines, is the EEOC charge he filed following his June 1994 discharge. However, plaintiff has not satisfied the "causal link" component of the prima facie case. In this

---

[13] Plaintiff's contention that he was protesting sexual harassment clearly takes his retaliation claim based upon this incident outside the ambit of § 1981, which only reaches race discrimination.

circuit, the causal link requirement is interpreted broadly. "[A] plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Meeks*, 15 F.3d at 1021. However, where a substantial period of time has elapsed between the filing of the EEOC charge and the termination, a causal connection is less likely to exist and a plaintiff must produce some evidence demonstrating a connection between the two events. In other words, the sequence of the two events, by itself, is not enough to create an inference of retaliation. *Leslie v. Mobile Transit Authority*, 963 F. Supp. 1142, 1148-49 (S.D. Ala. 1997); *Breech v. Alabama Power Co.*, 962 F. Supp. 1447, 1461 (S.D. Ala. 1997).

In this case, plaintiff filed his EEOC charge in July 1994, more than a year before his November 1995 discharge. This time span is too great to infer a connection between the two without any additional evidence, which plaintiff has not offered. *See, e.g., Leslie*, 963 F. Supp. at 1149 (more than a year is too long to support an inference of causal connection); *Breech*, 962 F. Supp. at 1460 (same); *Balleti v. Sun-Sentinel Co.*, 909 F. Supp. 1539, 1549 (S.D. Fla. 1995) (elapse of six months between grievance and discharge did not permit inference of causal connection); *Juarez v. Ameritech Mobile Communications, Inc.*, 746 F. Supp. 798, 804 (N.D. Ill. 1990) (six months between complaint and termination too remote), *aff'd*, 957 F.2d 317 (7th Cir. 1992); *Maldonado v. Metra*, 743 F. Supp. 563, 568 (N.D. Ill. 1990) (five months lapse between protected expression and termination too remote); *Reeves v. Digital Equipment Corp.*, 710 F. Supp. 675, 677 (N.D. Ohio 1989) (no retaliation where three months passed between protected expression and adverse employment action).

Assuming that plaintiff has established a prima facie case, Pemco's stated reason for terminating the plaintiff was his repeated insubordination. As previously discussed, the plaintiff

19

has not presented sufficient evidence for a reasonable jury to find this reason to be pretextual.

## C. Racially Hostile Work Environment

Title VII prohibits an employer from "discriminat[ing] against any individual with respect

to his compensation, terms, conditions, or privileges of employment, because of such individual's

race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has

held that Title VII is violated "[w]hen the workplace is permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.,*

*Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotations omitted). As the Supreme Court

recently emphasized, however, Title VII is not a "general civility code" because "it forbids only

behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale*

*v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, ___, 118 S.Ct. 998, 1003 (1998).[14] Furthermore,

the Court has emphasized the importance of employing a totality of the circumstances approach to

analyzing claims of "hostile work environment":

> [T]he objective severity of harassment should be judged from the
> perspective of a reasonable person in the plaintiff's position,
> considering "all the circumstances." (citation omitted). In . . .
> harassment cases, that inquiry requires careful consideration of the
> social context in which particular behavior occurs and is
> experienced by its target.

*Id.*

___

[14] Although *Oncale* and *Harris*, and many of the cases cited in this Memorandum Opinion,
involve hostile work environment claims concerning *sexual* harassment, the legal standards
developed through these cases apply with full force to claims of racially hostile work
environments. *See Edwards v. Wallace Community College*, 49 F.3d 1517 (11th Cir. 1995).

Both Reed and Pemco move for summary judgment as to Reed's racially hostile work environment claim. The court will first discuss a threshold matter involving the scope of Reed's claim before discussing the merits of the claim.

### 1. Scope of Complaint

Pemco argues that Reed, by virtue of the claims contained in his Complaint and 1995 EEOC Charge, has limited his hostile work environment claim to the abuse he allegedly experienced between his January 1995 reinstatement and his November 1995 discharge. Pursuant to principles of notice pleading, Federal Rule of Civil Procedure 8(a) requires a Complaint to contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." While Rule 8(a) provides a claimant considerable flexibility in stating grounds for relief, Federal Rule of Civil Procedure 9(f) emphasizes that "[f]or the purpose of testing the sufficiency of a pleading, averments of time and place are material and shall be considered like all other averments of material matter."

Applied to the employment discrimination context, the Eleventh Circuit has held that "like or related" claims of discrimination lie outside the scope of a complaint which only references one, time-specific instance of discrimination. *Coon v. Georgia Pacific Corp.*, 829 F.2d 1563, 1568-70 (11th Cir. 1987). In *Coon*, the plaintiff's complaint only referenced one allegation of discrimination in 1979. *Id.* at 1568. Without ever moving to amend her complaint, the plaintiff attempted to proceed to trial on other claims of discrimination. *Id.* The court emphasized that its basis for limiting the plaintiff to one triable issue (i.e., the 1979 claim) was rooted in concepts of notice pleading. *Id.* at 1569-70. In particular, the court refused to apply the "like or related" rule, *see Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970), which allows a

21

judicial complaint to include allegations of discrimination not contained in an EEOC charge if the

allegations are sufficiently like or related to those contained in the charge. *Coon*, 829 F.2d at

1569. The court emphasized that while a plaintiff *could* include like or related allegations in a

complaint, the plaintiff must still adhere to the pleading requirements of the Federal Rules of Civil

Procedure:

> That plaintiff could have pleaded her [additional claims] does not
> mean that she did so. The claims were not somehow present within
> her complaint despite her failure to allege them. The concern that it
> would be unfair to hold a charging party to rigid pleading-type
> requirements in the EEOC charge . . . does not permit a plaintiff to
> forego appropriate pleading when commencing a court action.

*Id.* at 1570 (internal citation omitted).

The Eleventh Circuit's strict adherence to pleading requirements contained in the Federal

Rules bear greatly on the present case. Here, Reed makes the following allegation in his

Complaint:

> After the plaintiff returned to work in January, 1995, he was
> subjected to a racially charged work environment. The plaintiff
> complained to management about the racial comments and slurs he
> was experiencing since his return. Specifically, he complained to
> Kurt Lutman. Mr. Lutman ignored his complaints.

Compl. at ¶ 13. Reed's 1995 EEOC Charge contains essentially the same allegation. (Reed Dep.,

Exh. 15). However, in his deposition testimony, Reed alleges that Pemco has subjected him to a

racially hostile work environment since "day one" of his employment. (Reed Dep. at 57).

Supporting his arguments with evidence of discriminatory behavior prior to his January 1995

reinstatement, Reed asserts in both his Motion for Summary Judgment and his opposition to

Pemco's Motion for Summary Judgment that he experienced a hostile work environment

throughout his employment. Similar to the plaintiff in *Coon*, Reed has never moved to amend his Complaint, yet he now endeavors to enlarge the scope of his hostile environment claim to include incidents between his hiring in 1981 to his firing in 1995. Because he has only pleaded the existence of a hostile work environment since January 1995, the court must conclude that Reed has failed to satisfactorily plead that such an environment existed prior to 1995. Therefore, Reed may only base his claim of a racially hostile work environment on his experiences following his January 1995 reinstatement.

### 2. Application of the Law to the Relevant Evidence

An employer may be liable for subjecting an employee to a hostile work environment if an employer's conduct "'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment.'" *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986) (citation omitted); *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11ᵗʰ Cir. 1989). Hostile work environment sexual harassment occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris*, 510 U.S. at 21 (internal citations omitted); *Cross v. Alabama*, 49 F.3d 1490, 1507 (11th Cir. 1995). The conduct at issue must be severe or pervasive enough to create an "objectively hostile or abusive work environment" to be actionable under Title VII. *Harris*, 510 U.S. at 21. Thus, the "mere utterance" of a remark that engenders offense does not affect the terms, conditions, or privileges of employment to a sufficient degree to violate Title VII. *Henson v. Dundee*, 682 F.2d 897, 904 (11ᵗʰ Cir. 1982). In addition, whether an

23

environment is "hostile" or "abusive" must be determined by looking at the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating as opposed to merely offensive, and whether the conduct unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23; *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521-22 (11th Cir. 1995).

To establish a prima facie case of hostile working environment, a plaintiff must show: (1) that the employee belongs to a protected group; (2) that the employee was subject to unwelcome harassment; (3) that the harassment complained of was based on race; and (4) that the harassment affected a condition of the complainant's employment. *Cross*, 49 F.3d at 1504. These prima facie elements, however, only establish one aspect of a hostile environment claim; the plaintiff must also establish liability on the part of the employer for the harassment perpetrated by its employees. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S.742, __, 188 S.Ct. 2257, 2265 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, __, 118 S.Ct. 2275, 2284 (1998).

In order for the plaintiff's prima facie claim of a racially hostile work environment to survive summary judgment, he must initially establish that there is a genuine issue of material fact as to whether the events at Pemco, subsequent to his reinstatement, created an atmosphere which was sufficiently severe and pervasive so as to alter the conditions of the plaintiff's employment and create an abusive working environment. *Vinson*, 477 U.S. at 67. Reed alleges that he was physically threatened and referred to as a "nigger" on one occasion and "black ass" on the other by two separate white coworkers. Reed was also called the racially derogatory

24

name 'Buckwheat" by a coworker. Inscriptions of KKK and other racist graffiti were written or scratched in various places, including sexually explicit pictures of African-American women on the bathroom walls. Reed alleged that racially based jokes were told on a daily basis, although he only identified two individuals as the culprits. In determining whether a hostile environment existed, a court is to examine the totality of the circumstances. The factors to consider include (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 22-23; *Edwards*, 49 F.3d at 1521-22.

The court finds the decision in *Mitchell v. Carrier Corporation*, 954 F. Supp. 1568 (M.D. Ga. 1995), *aff'd*, 108 F.3d 343 (Table, No. 95-9444) (11th Cir. 1997), particularly persuasive. In *Mitchell*, several plaintiffs claimed to have experienced a racially hostile work environment. Plaintiff Mitchell observed racial graffiti on the bathroom walls such as "Woody Wilson-Nigger Ape," "Nigger," and "Niggers go home to Africa." He further testified that some of this graffiti remained on the bathroom walls for months, despite complaints to management by him and others. Plaintiff Mitchell also noticed rebel flags and the initials "KKK" drawn on travel packets, which are envelopes affixed to refrigeration units within the plant. He reported these incidents to his supervisor. He also relied on an incident in which a co-worker repeated racially derogatory statements made about him by another co-worker. The court found that this evidence did not create a hostile work environment and granted summary judgment in favor of the employer:

> The severity of both the graffiti and the co-worker's statement is diminished by
> the circumstances of the case. With regard to the graffiti, those responsible for
> the graffiti were unknown and the epithets were written, rather than spoken.
> Likewise, although the racist statement repeated by Mitchell's co-worker may
> have been directed at Mitchell, the statement was only second-hand information.

*Id.* at 576-77.

Plaintiff argues that *Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997), in

which the Eleventh Circuit reversed a summary judgment on a hostile environment claim,

precludes the entry of summary judgment in favor of Pemco. The court disagrees. In that

case, there was substantial evidence of repeated harassing conduct directed at the plaintiff. The

plaintiff's supervisor wrote her sexually explicit notes, solicited sexual favors from her, and

touched her in an inappropriate manner on one occasion. There was also evidence that

plaintiff's supervisor told sexually explicit jokes and treated other employees in a similar

manner. In addition, there was evidence in the record that employees engaged in sex at the

plant, told sexually graphic jokes, groped and exhibited one another's breasts and genitalia, and

that employees used various chicken parts to mimic sexual organs and activities. There was

apparently also sufficient evidence in the record to establish the company's knowledge of all of

this conduct. *Id.* at 644.

The facts and circumstances of this case are similar to those in *Mitchell* and dissimilar to

the facts and circumstances of *Allen*. Considering all the allegations by Reed concerning his

work environment after he was reinstated in January 1995 and drawing all reasonable inferences

in his favor, the court concludes, as a matter of law, that any harassment was not sufficiently

severe or pervasive so as to alter the conditions of Reed's employment and create an abusive

working environment. Thus, summary judgment is due to be granted on Reed's claim of a racially hostile environment.

Even if Reed had established that he was subjected to a racially hostile environment subsequent to his reinstatement in January of 1995, his claim against the defendant would still fail. In order to hold an employer directly liable for a co-employee's harassment of another employee, the plaintiff must prove that her employer knew or should have known of the harassment and failed to take prompt remedial action. *Steele*, 867 F.2d at 1316. The corrective action must be reasonably likely to prevent the harassment from recurring. *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1996). An employee can show that the employer knew or should have known of harassment by showing either that he complained to higher management of the problem or that the harassment was so pervasive as to confer constructive knowledge on the part of higher management. *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904 (11th Cir. 1988). Some factors for a court to consider in determining whether an employer had constructive knowledge are (1) the remoteness of the location of the harassment as compared to the location of management; (2) whether the harassment occurs intermittently over a long period of time; (3) whether the victims were employed on a part-time or full-time basis; and (4) whether there were only a few, discrete instances of harassment. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646-47 (11th Cir. 1997). However, "an employer is insulated from liability under Title VII for a hostile environment [racial] harassment claim premised on constructive knowledge of the harassment when the employer has adopted an anti-discrimination policy that is comprehensive, well-known to employees, vigorously enforced, and provides alternative avenues

27

of redress." *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1553-54 (11th Cir. 1997).[15]

Reed claims that racially based jokes were common throughout the workplace. However, he could only specifically name two people who told such jokes, neither of whom were members of higher management. There is no evidence in the record that members of higher management engaged in this conduct, nor is there evidence that they knew or should have known of such conduct.

Reed also asserts that a co-employee called him "Buckwheat" during this period. However, Reed never reported this conduct to management. Thus, there is no evidence that anyone in management knew or should have known of this conduct.

Reed claims he was unduly reprimanded because he stared at a white woman. Yet, Reed concedes that his supervisors never mentioned race when they discussed the incident with him. Furthermore, Reed was not even formally disciplined. Thus, a reasonable jury could not find that this incident put Pemco on notice of a racially hostile environment.

Reed complained twice to Lutman that an employee directed a racial epithet towards him. On both occasions, Lutman investigated the incidents but did not come to a conclusion as to the veracity of the complaints. Given Lutman's efforts to investigate these complaints it cannot be

---

[15]    Pemco argues that its policies entitle it to the protection afforded by the Eleventh Circuit's recent decision in *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548 (11th Cir. 1997). This court finds that Pemco's policy falls somewhere in between the ones at issue in *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986) and *Farley*. Pemco's policy exceeds the one at issue in *Meritor* in that it specifically addresses racial harassment. On the other hand, the evidence that the policy was communicated to the employees is not as strong in this case as in *Farley*, where the employer held training classes concerning its policy. In this case, the evidence is simply that the policy was posted. Accordingly, while the fact that Pemco has a policy against racial harassment is relevant, this court is not willing to conclude that it is sufficient to insulate Pemco from liability in this case.

said that he knew or should have known of racial harassment and failed to take prompt remedial action.

Reed also points to the fact that inscriptions of KKK and other racist graffiti were written or scratched in various places and sexually explicit pictures of African-American women were on the bathroom walls. Reed testified that he reported this graffiti to Drummond. However, the evidence in the record demonstrates that Pemco repeatedly painted and attempted to remove such graffiti. Although Pemco had notice of such graffiti, the evidence in the record demonstrates that Pemco took prompt remedial action to have it removed.

No reasonable jury could find that Pemco knew or should have known of racial harassment and failed to take prompt remedial action. Thus, summary judgment on Reed's claim of a racially hostile environment is due to be granted.[16]

## IV. CONCLUSION

Plaintiff's evidence raises no genuine issues of material fact regarding his claims of discriminatory discharge, retaliatory discharge, and racially hostile environment and defendant is entitled to a judgment as a matter of law. Plaintiff's Motion for Summary Judgment on the claim of a racially hostile environment is due to be denied. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this 3l𝒔𝒕 day of March, 1999.

Sharon Lovelace Blackburn

SHARON LOVELACE BLACKBURN
United States District Judge

_____

[16]Because this case does not involve harassment by a supervisor, the holding in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), is inapplicable to this case.

29